**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

BACKJOY ORTHOTICS, LLC,

Plaintiff,

v.

FORVIC INTERNATIONAL INC., WOOK
YOON, and various JOHN DOES and JANE
DOES, and ABC COMPANIES,

Defendants.

CASE NO: 6:14-cv-00249-JA-TBS

JURY TRIAL REQUESTED

INJUNCTIVE RELIEF REQUESTED

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER *EX PARTE***
**AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff BACKJOY ORTHOTICS, LLC ("BackJoy" or "Plaintiff"), by and through

undersigned counsel, and pursuant to Rule 65 (a) of the Federal Rules of Civil Procedure and

Rule 4.05 of the Local Rules of the United States District Court for the Middle District of Florida,

respectfully moves for a temporary restraining order ("TRO") *ex parte* against Defendants

FORVIC INTERNATIONAL, INC. ("Defendant Forvic"), WOOK YOON ("Defendant Yoon")

(together with Defendant Forvic, the "Defendants") as well as all those acting in concert with

them.  BackJoy requests the TRO *pendent lite* restraining Defendants from, *inter alia*, their

continued misappropriation of BackJoy's confidential, proprietary and trade secret information,

unfair competition and false advertising, violation of the parties' non-compete agreement and

copyright infringement.  Defendants are foreign nationals and service must be perfected in

accordance with the requirements of the Hague Convention on Service Abroad of Judicial and

Extrajudicial Documents (the "Hague Convention").  The TRO should remain in effect until

Defendants appear or otherwise move upon service against them.

## PRELIMINARY STATEMENT

This case involves events that unfortunately have become more commonplace in today's world.  A small but growing company achieves notoriety in its selected field.  Seeking to capitalize on that growing popularity, the company's Asian-based supplier/manufacturer, in direct violation of non–disclosure and non-compete covenants, steals confidential, proprietary and trade secret information to establish a competing business.  Through no fault of its own, the company is -- as is Plaintiff herein -- forced into an unwanted and costly battle for its very survival.  Monetary compensation alone is insufficient.  Companies such as Plaintiff find themselves in the proverbial "melting ice cube" situation:  without immediate assistance, there may be no business left to compensate.  Recognizing the irreparable damage that can be wrought pending a final judgment (*i.e.,* potential loss of distributors, customers, and general goodwill), courts -- including this one -- have not hesitated to grant injunctive relief, as well as temporary restraining orders when necessary.

Here, the TRO is not only warranted, it is <u>imperative</u>.  Defendants are resident in Korea and must be served via the Hague Convention.[1]  Such service will take at least five months, perhaps more.  Because of the notice and hearing requirements associated with a preliminary injunction, months could go by while Defendants' illegal activity continues unabated.  A TRO is the appropriate interim remedy pending perfection of service of Plaintiff's application and subsequent preliminary injunction hearing.  TROs generally are short in duration.  However, ample precedent exists to extend such orders for up to several months in cases requiring service via the Hague Convention.

---

[1] Plaintiff's Complaint was filed on February 13, 2013.  Presently it is out for service in accordance with Hague Convention.  A courtesy copy was sent to Defendants' known e-mail address on February 21, 2013.  A read receipt notice shows that the e-mail was opened on February 24, 2013.  To date, no response has been forthcoming.

Plaintiff BackJoy creates and distributes novel and innovative solutions designed to enhance posture and to relieve and prevent back pain, with various products in the sit, stand, and sleep categories.  In particular, Plaintiff has created, marketed and sold an innovative orthotic device, known as the BACKJOY® orthotic seat device, which one sits on to realign various parts of the body, and which is now sold throughout the world ("BJ1 Device").  On the basis of sales of its BJ1 Device, Plaintiff has grown significantly since 2006.  Plaintiff continually has sought to improve and modify its core product as well as adding a lumbar support ("BJ2 Device"),[2] which is the subject of a pending patent application in the United States and elsewhere.

Starting in 2007 through 2013, Defendant Forvic (run by Defendant Yoon) was the sole supplier of the BJ1 Device.  Defendants made the BJ1 Device in a factory in China pursuant to detailed instructions and specifications provided to them in confidence by Plaintiff.  Before moving forward, however, the parties executed a non-disclosure/non-compete agreement.  The explicit and exclusive purpose of the business relationship, which is reflected in the course of the parties' dealings and detailed correspondence was for Defendants to supply the signature BJ1 Device.  Both parties prospered greatly from this arrangement.

In a dramatic turn of events however, Plaintiff recently learned that Defendants have misappropriated confidential, proprietary and trade secret information regarding the BJ1 Device and the BJ2 Device (collectively, the "BackJoy Products") and are now manufacturing, marketing, and selling their own unauthorized, illegal and low-quality versions thereof (the "Copy Products").  Defendants' actions are in direct violation of a Confidential Disclosure and

---

[2] Plaintiff is in the process of changing over the naming system for its products in the sit category to "SitSmart."

Non-Compete Agreement entered into between the parties on January 4, 2007 (the "Non-Compete Agreement") as well as the trust imposed in good faith by Plaintiff.[3]

At the time the Complaint was filed (see FN1 supra), Plaintiff had learned only that Defendants planned to proceed with production of the Copy Products.  Plaintiff has now learned, however, that Defendants have accelerated the pace of their production and are actively seeking to sell their products globally.  Moreover, Plaintiff has just learned that there is actual confusion between the products in the marketplace.  These new circumstances warrant this Court's immediate intervention.   Plaintiff now faces the very real prospect of losing both authorized distributors and customers.  Moreover, Plaintiff faces the potential devastating loss of goodwill due to the inferior quality of the Copy Products.  Once goodwill is lost, it is virtually impossible to recover.

## FACTS SUPPORTING TEMPORARY RELIEF[4]

**A.    Plaintiff's Formation, Development of Its Business, and Efforts to Protect Its Confidential, Proprietary, and Trade Secret Information.**

Plaintiff owes its inception to a son's passion to ease his father's back pain.  In 1984, Preston Willingham ("Willingham"), an entrepreneur, inventor and nationally renowned sculptor, wanted to design a product that would ease the back pain and discomfort his father suffered.  Willingham invented what turned  out to be the first in an expanding line of BACKJOY®-branded products.  During that same year, Willingham formed BackJoy of Florida, Inc. ("BJ Florida") as the vehicle to exploit this initial product.  He later obtained a patent for his

[3] Jurisdiction and venue properly lie with this Court.  See Compl., ¶¶ 11-15.  The Non-Compete Agreement specifically provides for jurisdiction of courts (state or federal) sitting in Orange County, Florida, as well as for the application of Florida law.  See Affidavit of Preston Willingham, ¶ 7, Ex. C.

[4] Evidence demonstrating BackJoy's right to injunctive relief includes:  (1) Affidavit of Bing Howenstein, Chief Executive Officer at BackJoy ("Howenstein Aff."); (2) Affidavit of Preston Willingham, Chief Technology Officer at BackJoy ("Willingham Aff."); and (3) Affidavit of Roman Khaykin, Owner and Investigator at InfoTactic Group, Inc. ("Khaykin Aff.").

4

orthotic seat, Patent No. 5,887,951 (the "951 Patent"), as well as a trademark for the name BACKJOY.  (Howenstein Aff., ¶ 8).

Ever since, Plaintiff (and its predecessors) have been designing innovative and novel products to improve posture and reduce back pain.  Plaintiff has offered a wide range of back support and posture products, including its flagship line of innovative orthotic seat supports, BACKJOY Core®, BACKJOY Posture+, BACKJOY Relief, BACKJOY Relief+, BACKJOY Posture+ Team, Relief Mini, Relief Mini+ and Posture+ Mini seat inserts.  Plaintiff has developed a new version of the seat, the BJ2 Device referenced above.  The BJ2 Device, which incorporates a lumbar support, is in manufacture and expected to reach retail stores shortly. (Howenstein Aff., ¶ 7).[5]

In 2005 Willingham and BJ Florida terminated their relationship.  Willingham then granted the rights to exploit the orthotic seat device (and all intellectual property and trade secrets appurtenant thereto) to Willingham Design & Manufacturing, Inc. -- the company that entered into the Non-Compete Agreement with Defendant Forvic.  That same year Howenstein joined with Willingham to continue to exploit Plaintiff's products.  (Howenstein Aff., ¶¶ 9-10). As a result, Plaintiff herein was formed.  As of 2010, through a series of various transactions, Plaintiff holds all rights in and to its predecessors' intellectual property, rights to enforce previous agreements, and any and all rights developed subsequent thereto.  (Howenstein Aff., ¶¶ 11-12).

Plaintiff takes various measures to protect its intellectual property as well as its confidential, proprietary, and trade secret information.  Plaintiff specifically requires its

---

[5] Genuine BackJoy Products are sold throughout the United States and currently distributed in over 40 countries, including South Korea, through <u>authorized</u> distributors.

suppliers, manufacturers, and distributors to sign non-disclosure and non-compete agreements (as applicable) prior to providing relevant information.  (Howenstein Aff., ¶ 15).

**B.      Defendants Were Granted Limited Access to Plaintiff's Confidential, Proprietary, and Trade Secret Information in Their Position as Plaintiff's Key Supplier/Manufacturer.**

Prior to 2007, Defendants were in the business of manufacturing materials used in footwear and had no expertise in the orthotic industry nor had they ever designed, developed, manufactured, distributed, offered for sale or sold any orthotic back products or seat inserts in any manner similar or related to the BackJoy orthotic seat embodied in BJ1 and BJ2 Devices. (Willingham Aff., ¶ 6).

The first contact between Plaintiff and Defendants occurred on December 30, 2006, when Willingham contacted Defendants by email seeking information regarding their manufacturing capabilities.  (Willingham Aff., ¶ 6, Ex. A).  After corresponding via email, Defendant Yoon requested that Willingham send samples of BackJoy Products "for our study."  (Willingham Aff., ¶ 7, Ex. B).  Before making any such disclosure or shipment of information, Willingham emailed Defendant Yoon the Non-Compete Agreement and stated that he would send sample BackJoy Products provided Defendant signed and returned said agreement.  (Willingham Aff., ¶ 7, Ex. C).

By email dated January 3, 2007, Defendants signed the agreement by agreeing to the terms thereof, stating: "[b]asically, we agree what you mean in this agreement," (expressing at the same time some concerns about necessary internal disclosure of information to "mould planner, mould shops, raw material's [*sic*] supplier, raw materials' technicians etc") and went on to say:

> Of course, we will keep all informations confidencially [*sic*] for your goods and will train all people who are related with the development of your goods to treat all informations for your goods

6

> confidencially [*sic*].  But, the story (not serious informations or
> technical notice) for your goods will be able to flow to other place
> or to unknown people through us known people like above cases.

(Willingham Aff., ¶ 9, Ex. D).  On January 4, 2007, Willingham responded via email that reads

"Dear Wook Yoon, Your comments made me fell [*sic*] more confident about proceeding.  I

understand the issues very well.  You are in the middle.  How do you suggest we proceed? "

(Willingham Aff., ¶ 10, Ex. E).  The "how do you suggest we proceed" comment referred to

moving forward with the business relationship.  (Willingham Aff., ¶ 10).  In response, Defendant

Yoon provided the address for the samples to be shipped and noted that a meeting would be

scheduled after they reviewed.  (Willingham Aff., ¶ 10, Ex. F).  In reliance on Defendants'

agreement to the Non-Compete Agreement, Plaintiff then moved forward to start a

manufacturing relationship with Defendants.  (Willingham Aff., ¶ 11).

Between 2007 and November 23, 2013, Defendants supplied and manufactured materials

used in BackJoy Products as instructed by Plaintiff.  Defendants initially had difficulty in

manufacturing the orthotic seats.  Willingham frequently traveled to meet with Defendants and

their factory workers to provide them with relevant expertise and know-how so that the BackJoy

Products could be manufactured to Plaintiff's standards and specifications.  In doing so,

Willingham provided Defendants with confidential, proprietary, and secret information,

including but not limited to, drawings, photographs, molds, prototypes, and how-to instruction

manuals.  (Willingham Aff., ¶¶ 13-14).

On repeated occasions, including at a meeting on November 23, 2013, Defendants

confirmed that they had signed, agreed to, and understood the terms of the Non-Compete

Agreement.  Plaintiff completely relied on Defendants' adherence to the terms of the Non-

Compete Agreement in continuing to give Defendants the business of making BackJoy Products

as well as disclosing plans for new and improved versions of such products, including but not limited to the BJ2 Device.  (Willingham Aff., ¶¶ 12-13).

    **C.**     **Plaintiff's 2007 Disclosure to Defendants of the Concept of a Lumbar-Support Orthotic Seat.**

On July 16, 2007, Willingham emailed Defendants regarding his company's confidential plans for developing an orthotic seat with lumbar support that included adjustable height capabilities.  (Willingham Aff., ¶ 15, Ex. G).  On December 11, 2008, at a meeting between Willingham and Defendant Yoon ("December 11, 2008 Meeting"), Willingham provided Defendant Yoon prototypes of this new design.  (Willingham Aff., ¶ 15, Ex. H (photograph of Willingham and Defendant Yoon discussing prototype); Howenstein Ex. B (photographs of design).

In response, Defendants indicated they would not be able to make the product (which ultimately became the BJ2 Device).  In fact, they said no one could make such a product.  Despite saying this, Defendants tried on several occasions to make Plaintiff's new device.  However, all the proposed prototypes were rejected by Plaintiff due to their sub-standard construction.  In 2010, Plaintiff made a final determination that the BJ2 Device would need to be made by a different manufacturer.  (Willingham Aff., ¶¶ 16-17).

Nonetheless, in continuing good faith, Plaintiff maintained its relationship with Defendants and, until recently, routinely placed orders with Defendants for the manufacture of the BJ1 Device and other BackJoy Products.  (Willingham Aff., ¶ 18).

    **D.**     **As Early as 2011, Defendants Misappropriated Plaintiff Confidential and Proprietary Information to Start a Competing Business.**

Defendants' "S-Back" titled product is one of Defendants' Copy Products.  (Howenstein Aff., ¶ 16).  Defendants' websites currently advertise two different S-Back products, the "S-Back

Pro" and the "S-Back Standard." *see, http://s-back.net/main/index.* Plaintiff has examined samples of the Copy Products. These products incorporate the design and know-how of the patented BJ1 Device as well as Plaintiff's extremely confidential plans for the BJ2 Device. Until Plaintiff disclosed its confidential information, Defendants had neither the knowledge nor concept of building an orthotic seat device with lumbar support. (Howenstein Aff., ¶¶ 16-18 and Willingham Aff., ¶ 6).

At least as early as 2011, during the period that Defendants were Plaintiff's sole supplier, Defendants stole the confidential information and trade secrets of Plaintiff in the BJ2 Device and the know how making the BJ1 Device to develop their Copy Products. This date can be determined because Defendants, with unmitigated gall, applied for and received various foreign patents[6] and trademarks relating to the S-Back -- all while keeping this secret from Plaintiff. (Howenstein Aff., ¶ 19). To do everything Defendants have done would require them to start no later than 2011.

**E.     Defendants' Illegal Use of Plaintiff's Copyrighted Materials.**

The Copy Products are advertised, promoted and sold in the same channels of trade and to the same customers as the BackJoy Products, including but not limited to advertising and promotion on the Internet. The Copy Products are marketed and promoted on Defendants' English-language website, http://healthchair.forvic.com/eng//. (Howenstein Aff., ¶ 22, Ex. E). Defendants falsely advertise that the "S-Back" products are the "World's first cushioned back orthotic using body weight." (http://healthchair.forvic.com/eng/index.php). This is, in fact, one

---

[6] Defendants have obtained a patent on the lumbar-support device in South Korea. (Howenstein Aff., ¶ 19). The application falsely identifies Defendants as the inventor and not Preston Willingham. Plaintiff is in the process of filing a cancellation proceeding in South Korea.

of the claims associated with the '951 patent owned by Plaintiff, antedating Defendants' alleged invention.  (Howenstein Aff., ¶ 23).

Plaintiff has developed and owns all rights, including copyrights, in its proprietary marketing and advertising material used in connection with its sale of  BackJoy Products.  The design, configuration and distinctive features of its copyrighted photographs and drawings / catalogue / website (www.backjoy.com), and of works related thereto are wholly original with Plaintiff.  On December 5, 2013, Plaintiff applied for registration of its photographs and drawings / catalogue / website with the United States Copyright Office, Case # 1-1051714791.  Registration is currently pending.   (Howenstein Aff., ¶ 26).

Defendants' marketing and related print and digital materials contain numerous photographs and drawings that are substantially similar to Plaintiff's copyrighted works.  Defendants have "lifted" the layout, design and overall impression of Plaintiff's photographic illustrations to sell the Copy Products.  (Howenstein Aff., ¶ 27; Ex. G; Compl., ¶¶ 45-48).

**F.      Defendants' Increasing Promotion of the Copy Products and Their Refusal to Stop.**

In late 2013, Plaintiff's authorized Korean distributor discovered the Copy Products being marketed at a trade show in South Korea.  The Copy Products appeared substantially similar if not identical to BackJoy Products.  The distributor notified Plaintiff of its discovery.  This was the first notice Plaintiff had of Defendants' betrayal.  (Howenstein Aff., ¶ 20).

Plaintiff determined that Defendants had just started to manufacture and market the Copy Products in the form of the S-Back Device.  Plaintiff subsequently obtained samples of Defendants' S-Back and sought a meeting with Defendants to discuss the:  (i) blatant copying by Defendants of the BJ1 Device; (ii) misuse by Defendants of confidential information including,

10

in particular, the development of an orthotic seat device with a lumbar support; and (iii) the prohibited direct competition by Defendants.  (Howenstein Aff., ¶ 21; Khaykin Aff., ¶¶ 5-11).

On November 23, 2013, Plaintiff's representatives met with Defendants, to demand, *inter alia,* that Defendants cease any manufacturing and sale of the S-Back Device or any other products that competed with BackJoy Products.  Plaintiff delivered its demand orally and by letter.  Defendants refused to stop.  (Howenstein Aff., ¶ 24). Plaintiff terminated all business relations with Defendants at the end of 2013.  (Howenstein Aff., ¶ 28).

In March 2014, Plaintiff was informed that Defendants have ramped up their sales efforts in South Korea in earnest.  (Howenstein Aff., ¶ 30).  Through investigation Plaintiff has learned that this is a first move on a global basis for Defendants.  (Khaykin Aff., ¶ 11).  As part of their global plan, Defendants are now going so far as to use laudatory references by alleged United States consumers.  (Howenstein Aff., ¶ 30).  The increased sales effort is a dramatic attempt by Defendants to steal the relevant market before they have to respond to the Complaint.  In fact, Plaintiff has just learned that there is actual confusion between the products in the marketplace. (Howenstein Aff., ¶ 31).

## ARGUMENT

### I.      THIS COURT HAS THE AUTHORITY TO ISSUE AND EXTEND THE TRO.

District courts have discretion to issue temporary relief to protect the moving party from irreparable injury and to preserve the power of the trial court to render a meaningful decision. See Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011).  The chief function of the order is "to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated."  SunTrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1265 (11th Cir. 2001).

A.        **Standards Governing Issuance of a TRO.**

Injunctive relief is proper where the moving party shows that:  (1) there is a substantial likelihood of success on the merits; (2) it will suffer irreparable harm unless issued; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest.  Lebron v. Florida Dep't of Children & Families, 2013 U.S. App. LEXIS 3998, at *5-6 (11th Cir. Feb. 26, 2013); Int'l Cosmetics Exchange, Inc. v. Gapardis Health & Beauty, Inc., 303 F.3d 1242, 1246 (11th Cir. 2002).  For purposes of a TRO, an applicant also must show a need for immediate relief to avoid irreparable injury that will likely occur if the relief is not granted before the parties can be heard.  See Fed. R. Civ. P. 65(b).  A district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction.  Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995).

Several of the statutory claims asserted by Plaintiff specifically authorize the award of injunctive relief.  The Copyright Act permits this Court to award injunctive relief to prevent future copyright infringement.  See 17 U.S.C. § 502(a) (2012).  The Lanham Act authorizes the award of injunctive relief to prevent continued unfair competition and false advertising.  See 15 U.S.C. § 1116 (2012).  The Florida Uniform Trade Secrets Act ("FUTSA") specifically authorizes a court to enter an injunction to prevent misappropriation.  See Fla. Stat. § 688.003 (2012).[7]  In addition, this Court has previously granted temporary relief in similar situations based on the various state-law claims asserted.  See, e.g., Electrostim Med. Servs. v. Lindsey, et al., 2012 U.S. Dist. LEXIS 56243, at *32-33 (M.D. Fla. Mar. 13, 2012) (granting preliminary injunctive relief based on breach of contract claim for violation of restrictive covenant and

---

[7] Patent Laws also authorize the use of injunctive relief to prevent patent infringement.

12

disclosure of confidential business information).  See also Ryan, LLC v. Evans, 2012 U.S. Dist.

LEXIS 59692, at *23 (M.D. Fla. Apr. 30, 2012) (preliminary injunction for alleged violation of

Florida Deceptive and Unfair Trade Practice Act, Fla. Stat. § 501.201, et seq. ("FDUTPA")).

     Defendants have begun to sell the Copy Products in earnest, giving rise to the urgency of

the requested instant relief.  Defendants' actions, which are in direct violation of the Non-

Compete Agreement and predicated on the theft of Plaintiff's intellectual property, will -- unless

restrained by this Court -- irreparably damage Plaintiff's hard-won goodwill with its customers

and authorized distributors and the goodwill and intrinsic value of its global brand, BACKJOY®.

    **B.**    **Awaiting Perfection of Service on a Foreign Defendant Under the Hague Convention Is Good Cause to Extend the TRO.**

     As a general rule, a court is authorized to issue a temporary restraining order lasting no

longer than 14 days, and can extend the order for one like period for good cause.  See Fed. R.

Civ. P. 65.  The Federal Rules of Civil Procedure specifically require that a court set a

preliminary injunction hearing at the earliest possible time when the restraining order is issued

without notice.  Fed. R. Civ. P. 65(b)(3).  Recognizing the serious nature of the TRO, the rules

contemplate that  it is "imperative to allow [a defendant] to address the Court as soon as possible

to ensure that continued injunctive relief is proper."  Samsung Electronic Co., Ltd. v. Early Bird

Sav., 13–CV–3105–BEN (DHB), 2014 WL 324558  at *1 (S.D. Ca. Jan. 27, 2014). That said,

where a plaintiff is unable to promptly serve a foreign defendant because the only means of

service (i.e. Hague Convention) cannot be completed within the usual deadlines, the court may

extend the restraining order until proper service can be completed.  See H.D. Michigan, LLC v.

Hellenic Duty Free Shops S.A., 694 F.3d 827, 844 (7th Cir. 2012).   The court derives its

authority to do so from the very text of rule 65, which provides that such orders may be extended

ME1 17559983v.3

for good cause.  Id.  If such orders were not permitted to remain in effect until service, Rule 65

would in essence be inoperable against foreign defendants, which is not the intended result.

Early Bird Sav. 2014 WL 324558 at *2; see also Almetals, Inc. v. Wickeder Westfalenstahl,

2008 WL 624067, at *4 (E.D. Mich. Mar. 6, 2008).

Defendants are a South Korean company and a South Korean national.  Because South

Korea is a signatory to the Hague Convention, service of process must be effected pursuant to

the requirements of that treaty.  Plaintiff had planned to file its preliminary injunction application

following effective service of the Complaint and appearance by Defendants.  However,

Defendants' actions in attacking Plaintiff's markets through actual and increasing sales force

Plaintiff to seek the prayed-for urgent relief.  (Howenstein Aff., ¶ 33).  This Court should issue

the *ex parte* TRO immediately and provide for extension thereof pending service under the

Hague Convention.  See supra Hellenic Duty Free Shops.

## II.   PLAINTIFF SATISFIES ALL CONDITIONS FOR ISSUANCE OF THE TRO.

### A.   Plaintiff Is Likely to Succeed on the Merits.

Success on the merits is generally the most important factor when considering whether to

grant a motion for temporary relief.  Schiavo v. Schiavo, 357 F. Supp. 2d 1378, 1383 (M.D. Fla.

2005), aff'd, 403 F.3d 1223 (11th Cir. 2005).  The movant, however, must show "only likely,

rather than certain, success."  Home Oil Co., Inc. v. Sam's East, Inc., 199 F. Supp. 2d 1236, 1249

(M.D. Ala. 2002) (emphasis in original).  The requested TRO is warranted because:

### 1.   Defendants Have Stolen Plaintiff's Trade Secrets in Violation of Florida's Uniform Trade Secret Act.

A claim for misappropriation of trade secrets under Florida's Uniform Trade Secret Act

exists where: (1) plaintiff possessed secret information and took reasonable steps to protect its

secrecy; and (2) the secret it possessed was misappropriated, either by one who knew or had

reason to know that the secret was improperly obtained or by one who used improper means to

obtain it.  Del Monte Fresh Produce Co v. Dole Food Co., Inc., 136 F. Supp. 2d 1271, 1291 (S.D.

Fla. 2001) (applying Fla. Sta. § 688.002).  To qualify as a trade secret, the information must

derive economic value (actual or potential) from not being readily ascertainable from others who

can obtain economic value from its disclosure and must be subject to reasonable efforts to

protect its secrecy.  Id.

Plaintiff had in its possession confidential and proprietary information relating to its

orthotic seat (BJ1) and plans for a lumbar-support version (BJ2).  That information was not

known to others in the industry and was the brain-child of Willingham, who maintained all

information regarding concepts, drawings, and prototypes on his computer and back drives.

Plaintiff took definitive steps to protect the plans' secrecy, including the requirement for

manufacturers and suppliers to sign non-disclosure and non-competition agreements.  See, e.g.,

Fadalla v. Life Automotive Prods., Inc., 258 F.R.D. 501, 506 (M.D. Fla. 2007) (employer "made

reasonable efforts, i.e., through non-disclosure and secrecy agreements to maintain the

confidentiality of such information.").  Plaintiff specifically sought and obtained Defendants'

assurances that they would abide by the terms of confidentiality imposed.  By misappropriating

Plaintiff's technology, provided to it in strictest confidence, to manufacture, market, and sell the

Copy Products, Defendants have engaged in improper misappropriation of trade secrets under

FUTSA.  See Stoneworks, Inc. v. Empire Marble & Granite, Inc., No. 98-2017, 1998 U.S. Dist.

LEXIS 21762 at *11 (S.D. Fla. Nov. 19, 1998) (misappropriation of trade secrets under Chapter

688 is a "foregone conclusion where a trusted employee [or other business associate] discloses

15

trade secrets after receiving them under circumstances of obvious confidentiality and contractual obligations . . .").

### 2.  Defendants' Unfair Competition Violates the Lanham Act as Well as State Law.

#### a.  Lanham Act Violations

To state a claim for unfair competition/false advertising under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, Plaintiff must allege:  (1) the opposing party's advertisements are false or misleading; (2) the advertisements deceived or had tendency to deceive targeted audience; (3) the deception is material; and (4) the plaintiff has been or is likely to be injured as a result.  See Third Party Verification, Inc. v. Signaturelink, Inc., 492 F. Supp. 2d 1314, 1324 (M.D. Fla. 2007).  Unfair competition under Florida common law is an "umbrella [claim] for all  . . . causes of action . . . contrary to honest practice [and no single set of elements will apply]."  Id. at 1325. Instead, courts apply elements from established causes of action (such as Lanham Act or FDUTPA) on a case by case basis.  See Planetary Motion, Inc. v. Techplosion, Inc., 261 F.3d 1188, 1193 (11th Cir. 2001).  Defendants falsely advertise that the Copy Products are "the world's first cushioned back orthotic using body weight."  (A claim Plaintiff has made associated with the BJ1 Device, which Defendants know to be true).  In fact, Defendants have gone so far as to erroneously assert that they created the initial BJ1 Device.  (See Khaykin Aff., ¶ 8).  A claim patently false on its face.  Defendants have stolen Plaintiff's technology to make nearly identical (but inferior) Copy Products, which is intended and likely to confuse customers.

#### b.  FDUTPA Violations

The FDUTPA is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable,

16

deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. §

501.202(2).  Under FDUTPA, a litigant must demonstrate three elements: (1) a deceptive act or

unfair practice; (2) causation; and (3) actual damages.  In re Ford Motor Co. E-350 Van Prods.

Liab. Litig., 2012 U.S. Dist. LEXIS 13887, *108 (February 6, 2012) (citing Pop's Pancakes, Inc.

v. NuCO2, Inc., 251 F.R.D. 677, 685 (S.D. Fla. 2008)).  Plaintiff satisfies all three criteria.

Defendants' theft of Plaintiff's trade secrets and confidential information and their false claims

are deceptive and unfair by any standards.  This has resulted in and will result in further loss of

sales, markets, and distributors.  (Howenstein Aff., ¶¶ 32-33).  Finally, Plaintiff can and will

demonstrate a loss of profits directly attributable to Defendants' actions.

### 3.      Defendants' Breach of the Non-Compete Agreement.

Florida Statute § 542.335 sets forth the requirements for enforcing restrictive covenants

under Florida law.  Such covenants must be reasonable in time, area, line of business, and must

be justified by one or more legitimate business interests.  § 542.335 (1)(a)-(c), Fla. Stat.  It is

well settled in Florida that the protection of "confidential business information is considered a

legitimate business interest that can be protected by a restrictive covenant."  AutoNation, Inc. v.

O'Brien, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004).

Defendant Forvic entered into a covenant not to compete by "making or marketing a

device substantially similar to the BackJoy Orthotic Seat." (Howenstein Aff., ¶ 14).  This

covenant was necessary to, among other things, protect Plaintiff's:  (1) relationships with

prospective or existing customers and authorized distributors around the world; (2) trade secrets

and proprietary information; and (3) hard earned reputation and goodwill associated with its

trademarks and products.  Because this covenant is at the heart of a negotiated business

transaction, it is even more restrictive than a covenant merely incidental to employment.  See,

ME1 17559983v.3

e.g., USI Ins. Servs. of Florida, Inc. v. Pettineo, 987 So.2d 763, 766-67 (Fla. Dist. Ct. App. 4th

Dist. 2008) (recognizing the distinction between employment covenants versus those bargained

for in transactions).[8]   Regardless, while still acting as Plaintiff's supplier, Defendants secretly set

up a competitive business using trade secrets provided to them by Plaintiff.

### 4.      Defendants' Infringement of Plaintiff's Copyrighted Materials.

In evaluating whether or not a plaintiff has a substantial likelihood of success on the

merits for copyright infringement, the Court must determine whether a plaintiff holds a protected

copyright and whether the defendants wrongfully reproduced the copyrighted property.  Feist

Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 30, 349, 111 S. Ct. 1282, 1290 (U.S. 1991);

Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1214 (11th Cir. 2000); Dive N' Surf, Inc. v.

Anselowitz, 834 F. Supp. 379, 382 (M.D. Fla. 1993).  Here, Plaintiff developed the photos and

drawings for use in connection with its products long before Defendants began to use them on

their website to market and sell the Copy Products.  (Howenstein Aff., ¶¶ 25-26).  Defendants

had access to the photos and drawings only as a result of their business relationship with Plaintiff.

Plaintiff's copyright attaches at the moment of creation.  See Eldred v. Ashcroft, 537 U.S. 186,

195 (2003); Copyright Act, 17 U.S.C. § 302(a); Berne Convention for Protection of Literary and

Artistic Works (1971).  Plaintiff's formal copyright registrations are pending.  (Howenstein Aff.,

¶ 26).  Plaintiff never authorized Defendants' use of the materials in connection with the sale of

the Copy Products.  Defendants' use of Plaintiff's copyrighted materials is unlawful and should

be restrained.

---

[8] Florida law not only permits but specifically encourages courts to modify "unreasonable" non-competes rather
than refuse to enforce.  See Pinch-A-Penny of Pinellas County v. Chago, 557 So.2d 940 (Fla. Dist. Ct. App. 2nd Dist.
1990) (citing Miller Mech., Inc. v. Ruth, 300 So.2d 11 (Fla. 1974)).

B.     **Plaintiff Is Suffering Irreparable Harm.**

In order to qualify as irreparable, harm must be both "actual and imminent," which it is in the instant matter.   Northeastern Fla. Chapter of the Assoc. of General Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990).   Defendants have, *inter alia*:  (1) used Plaintiff's confidential and proprietary information – including trade secrets – to manufacture and sell the Copy Products in direct competition with Plaintiff; (2) infringed on Plaintiff's copyrighted materials to market the Copy Products; (3) violated the non-compete provision contained in the Non-Compete Agreement; and (4) damaged Plaintiff's reputation and goodwill by developing a nearly identical Copy Product (the S-Back) that is likely to be confused with the actual Plaintiff product, but which is vastly inferior in every respect.   Defendants' escalation of activities from manufacturing and marketing to actual sales in earnest raises the level of harm to imminent.

1.     **Irreparable Harm Is Presumed as to Defendants' Violation of FUTSA.**

Violation of a Florida statute that expressly authorizes a court to provide injunctive relief automatically gives rise to a presumption that the plaintiff has suffered irreparable harm.   See Select Portfolio Servicing, Inc. v. Evaluation Solutions, L.L.C., 2006 U.S. Dist. LEXIS 67276, at *36 (M.D. Fla. Sept. 20, 2006).   The statute specifically provides that any misappropriation, whether actual or merely threatened, may be enjoined.   See Fla. Stat. § 688.003; see also Hatfield v. AutoNation, Inc., 939 So.2d 155, 157 (Fla. Dist. Ct. App., 4th Dist. 2006) ("[a]n injunction with respect to stolen business secrets . . . will eliminate commercial advantage derived from the misappropriation.").

19

> **2.** **Irreparable Harm Is Presumed as to Defendants' Breach of the Non-Compete Agreement.**

Similarly, "violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." <u>See</u> <u>Electrostim</u>, at *37 (citing Fla. Stat. § 542.335(1)(j)). Irreparable harm is presumed to result from the breach of a contract that protects legitimate business interests. "[A] party seeking to enforce a restrictive covenant by injunction need not directly prove that the defendant's specific activities will cause irreparable injury if not enjoined. Rather, the statute provides that '[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." <u>Variable Annuity Life Ins. Co. v. Hausinger</u>, 927 So. 2d 243 (Fla. Dist. Ct. App., 2nd Dist. 2006) (citations omitted). The Florida Supreme Court "has held repeatedly that the "focus of preliminary injunctive relief is on maintaining long-standing relationships and pre-serving the goodwill of a company built up over the course of years of doing business." <u>Id.</u>; <u>see also</u> <u>North American Products Corp. v. Moore</u>, 196 F. Supp. 2d 1217, 1230-31 (M.D. Fla. 2002).

> **3.** **Irreparable Harm Is Presumed Because of Defendants' Use of Plaintiff's Copyrighted Material.**

The Court may also presume irreparable harm because Plaintiff has shown a likelihood of success on the merits of its copyright infringement claim. <u>Exchange Int'l., Inc. v. Vacation Ownership Relief, LLC</u>, 2010 WL 4983669, at *9 (M.D. Fla. Oct. 27, 2010) (<u>citing</u> <u>CBS Broad., Inc. v. EchoStar Communs. Corp.</u>, 450 F.3d 505, 517 (11th Cir. 2006) ("Under the Copyright Act, however, a plaintiff need not show actual irreparable harm in order to obtain an injunction, so long as there is past infringement and a likelihood of future infringement.")). In the case at hand, it is enough that Defendants continue to display infringing materials on their website.

20

4.      **Even Without a Presumption, Plaintiff Has Established Irreparable Harm.**

Defendants' activities in (i) marketing the Copy Products; (ii) making false claims with respect thereto; (iii) seeking to "steal" Plaintiff's hard-won markets and relationships; (iv) accelerating efforts to sell the Copy Products in Plaintiff's markets; and (v) actual sales of the Copy Products, which are nearly identical to but inferior in every respect to BackJoy Products, greatly tarnish Plaintiff's reputation and goodwill thereby resulting in a loss of distributors as well as customers.  Defendants' actions have already begun to impact Plaintiff's relations with its distributors.  (Howenstein Aff., ¶¶ 31-32).  Monetary compensation will not be sufficient to right these wrongs.  "Although economic losses alone do not justify a preliminary injunction, 'the loss of customers [and other business associates] and goodwill is an irreparable injury' [for which preliminary injunctions are appropriate]."  Mohr v. Bank of New York Mellon Corp., 393 F. App'x. 639, 646, 2010 WL 3273059, at *6 (11th Cir. 2010) (quoting BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F. 3d 964, 970 (11th Cir. 2005)).  Ride-Away Handicap Equip. Corp. v. Tracey, 2009 U.S. Dist. LEXIS 124610, *27-28 (M.D. Fla. Dec. 29, 2009) (holding that the loss of goodwill and fair competition may not be easily remedied by monetary damages).  Independent of the statutory presumptions of irreparable harm, irreparable harm is supported on the facts alone.

C.      **The Balance of Equities Overwhelmingly Favor Plaintiff.**

The equities of this case tip sharply in favor of Plaintiff, whose lawful intellectual property is being misappropriated and infringed.  See Specialty Chem. & Servs., Inc. v. Chandler, 1:87-CV–2338-MHS, 1988 WL 618583, at *11 (N.D. Ga. Sept. 29, 1988) ("[d]efendants cannot suffer compensable harm when enjoined from unlawful activity").

21

Defendants eventually may be entitled to develop their own orthotic-seat concept and compete in the market place. They are not, however, entitled to develop Copy Products that are substantially identical to the BackJoy Product using Plaintiff's own confidential, proprietary and secret information, which was provided to them in strictest confidence. Defendants' unclean hands tip the balance of equities completely in favor of Plaintiff.

**D.     Public Policy Favors Injunctive Relief.**

**1.     The Public Interest Is Served by the Protection of Trade Secrets.**

It is well-settled that the public interest is served by protecting trade secrets. Metallurgical Indus., Inc. v. Fourtek, Inc., 790 F. 2d 1195, 1201 (5th Cir. 1986). As this Court has previously recognized, a preliminary injunction affirmatively serves the public interest "by preserving the faith in the contractual agreements that businesses routinely make . . . and by rightfully protecting trade secrets from unlawful use and disclosure." Int'l. Hair & Beauty Systs., LLC v. Simply Organic, Inc., 8:11-CV-1883-30AEP, WL 5359264 (M.D. Fla. Sept. 26, 2011).

**2.     The Public Interest Is Served by the Prevention of Unfair Competition in Violation of Federal and State Law.**

The Court has a duty to enforce the law to stop unfair competition within the marketplace. "Although vigorous competition is a public interest . . ., the public is better served when misleading information is curtailed." Star-Brite Distributing, Inc. v. Kop-Coat, Inc., 664 F. Supp. 2d 1246, 1255 (S.D. Fla. 2009); 15 U.S.C. § 1125(a) (Lanham Act prohibits unfair competition).

**3.     The Public Interest Is Served by the Enforcement of Restrictive Covenants.**

The public interest also is best served by an injunction preventing Defendants from continuing to violate the Non-Compete Agreement. Public policy in Florida "favors

22

enforcement of reasonable covenants not to compete." O'Brien, 347 F. Supp. 2d at 1308; New Horizons Computer Learning Centers, Inc. v. Silicon Valley Training Partners, Inc., 2:02-CV-459-FTM-29-SPC, 2003 WL 23654790, at *8 (M.D. Fla. Nov. 12, 2003) ("the public has an interest in the enforcement of restrictive covenants.").

> **4.     The Public Interest Is Served by the Protection of Copyrighted Materials.**

Finally, public interest can only be served by upholding copyright protection and preventing the misappropriation of protected works. Stoneworks, Inc. v. Empire Marble & Granite, Inc., No. 98-2017, 1998 U.S. Dist. LEXIS 21762 at *17 (S.D. Fla. Nov. 19, 1998); Lakedreams v. Taylor, 932 F.2d 1103, 1110 (5th Cir. 1991). The public's general interest in competition is outweighed by concomitant interest in preserving rights protected by federal copyright law. Taylor, 932 F.2d at 1110.

## III.     AN *EX PARTE* ORDER IS APPROPRIATE.

A restraining order may be issued without notice to the adverse party if it appears by affidavit that immediate and irreparable damage will result before the adverse party's attorney can be heard in opposition. See Fed. R. Civ. P. 65(b); see also Local Rule 4.05. As explained above, Plaintiff will suffer immediate irreparable injury unless Defendants are enjoined. With each passing moment, Defendants are able to use information unlawfully acquired from Plaintiff to further solicit the company's potential clients as well as damage Plaintiff's business and reputation in the industry. See Merrill Lynch, Pierce, Fenner & Smith v. Schwartz, 991 F. Supp. 1480 (M.D. Ga. 1998) ("[I]n the rush to solicit clients . . . even a few days can suffice to cause irreparable injury in the way of lost clients and reputation in the community."). Given the requirements for service via the Hague Convention, it will be at least a few more months before

23

Defendants are properly served with the Complaint and subject to a preliminary injunction

hearing.  Accordingly, this Court should find that the prerequisites for temporary injunctive relief

without notice set forth in Federal Rules of Civil Procedure 65(b)(2) and Local Rule 4.05 have

been met.[9]

## IV.   PLAINTIFF SHOULD NOT BE REQUIRED TO POST A BOND.

The Federal Rules of Civil Procedure state that a bond must be posted whenever a court

issues a preliminary injunction.  Fed. R. Civ. P. 65(c).  However, it is well settled in this Circuit

and others that "the <u>amount</u> of the security required by the rule is a matter within the discretion

of the trial court . . . [and] the court may elect to require no security at all."  <u>BellSouth</u>

<u>Telecomms., Inc. v. MCIMetro Access Transmission Svcs., LLC</u>, 425 F.3d 964, 971 (11th Cir.

2005); <u>Elliot v. Kiesewetter</u>, 98 F.3d 47, 59-60 (3rd Cir. 1996) (a district court has the power to

waive the bond requirement when the balance of equities weighs overwhelmingly in favor of the

party seeking the injunction).  Defendants have stolen Plaintiff's trade secrets, are trying to pass

off the lumbar support feature of the Copy Product as their own invention, and are infringing on

Plaintiff's copyrighted materials for their own advertising purposes.  This conduct is clearly

egregious and Plaintiff should not be required to post a  bond to enjoin such wanton conduct.

To the extent a bond is required at all, the amount should be <u>de minimus</u>.

---

[9] Upon issuance, BackJoy will immediately serve Defendants with a courtesy copy of the instant motion papers and Order via their known email address.

24

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff respectfully requests that the Court grant a temporary restraining order against Defendants, in the form submitted herewith, to remain in effect until service can be perfected via the Hague Convention.


Dated: April 24, 2014                                  Respectfully submitted,

                                                       BACKJOY ORTHOTICS LLC

                                                       By its attorneys,

                                                       /s/ Jackson Adams
                                                       FL Bar Number 47970
                                                       Attorney For Plaintiff Backjoy Orthotics, LLC
                                                       Jackson W. Adams, P.A.
                                                       33 East Robinson St. Suite 206
                                                       Orlando, FL 32801
                                                       Telephone (407) 545-2249
                                                       Fax (407) 386-7915
                                                       E-mail: jadams@jwa-law.com

                                                       OF COUNSEL:

                                                       MCCARTER & ENGLISH, LLP
                                                       Harley I. Lewin
                                                       Stephanie J. Cohen
                                                       245 Park Avenue
                                                       New York, New York 10167

ME1 17559983v.3