# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

BACKJOY ORTHOTICS, LLC,

                Plaintiff,

    v.

FORVIC INTERNATIONAL INC., WOOK
YOON, and various JOHN DOES and JANE
DOES, and ABC COMPANIES,

                Defendants.

CASE NO: 6:14-cv-00249-CEM-TBS

JURY TRIAL REQUESTED

INJUNCTIVE RELIEF REQUESTED

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Plaintiff BACKJOY ORTHOTICS, LLC ("BackJoy" or "Plaintiff"), by and through undersigned counsel, and pursuant to Rule 65 (a) and (b) of the Federal Rules of Civil Procedure and Rule 4.06 of the Local Rules of the United States District Court for the Middle District of Florida, respectfully moves the Court to convert the Temporary Restraining Order, dated May 2, 2014 (TRO Doc. 10), into a preliminary injunction, restraining and enjoining Defendants FORVIC INTERNATIONAL, INC. ("Forvic"), WOOK YOON ("Yoon") (collectively, "Defendants"), and all those acting in concert with them from, *inter alia*, their continued misappropriation of BackJoy's confidential, proprietary and trade secret information, unfair competition and false advertising, copyright infringement, and violation of the parties' non-compete agreement.

As demonstrated in this Motion and Incorporated Memorandum of Law, the irreparable harm to BackJoy and the actual loss of its vital business interests are at stake. Pending a full and final resolution, a preliminary injunction is the only adequate remedy to protect BackJoy against

the harm that will inevitably follow should Defendants be allowed to continue their infringing activities.

<u>**PRELIMINARY STATEMENT**</u>

This case involves events that, unfortunately, have become increasingly more common in today's world. A small but growing company achieves notoriety in its selected field. Seeking to capitalize on that growing popularity, the company's Asia-based supplier/manufacturer, in direct violation of non–disclosure and non-compete covenants, steals confidential, proprietary and trade secret information to establish a competing business. Through no fault of its own, the company is -- as is Plaintiff herein -- forced into an unwanted and costly battle for its very survival. Monetary compensation alone is insufficient. Companies such as Plaintiff find themselves in the proverbial "melting ice cube" situation: without immediate assistance, there may be no business left to compensate. Recognizing the irreparable damage that is likely to ensue if Defendants are permitted to continue their activities pending a final judgment, (*i.e.,* potential loss of distributors, customers, and general goodwill), this Court has granted Plaintiff a temporary restraining order to prevent any further damage. (TRO Doc. 10) For that same purpose, courts such as this one routinely convert temporary restraining orders into preliminary injunctions pending a full and final resolution. Such relief is warranted here.

Plaintiff creates and distributes novel and innovative solutions designed to enhance posture and to relieve and prevent back pain, with various products in the sit, stand, and sleep categories. In particular, Plaintiff has created, marketed and sold an innovative orthotic device, known as the BACKJOY® orthotic seat device, which one sits on to realign various parts of the body, and which is now sold throughout the world (the "BJ1 Device"). On the basis of sales of its BJ1 Device, Plaintiff has grown significantly since 2006. Plaintiff continually has sought to

improve and modify its core product as well as adding a lumbar support ("BJ2 Device"), which is the subject of a pending patent application in the United States and elsewhere.

Starting in 2007 and through 2013, Defendant Forvic (run by Defendant Yoon) was Plaintiff's sole supplier of the BJ1 Device. Defendants manufactured the BJ1 Device in a factory in China pursuant to detailed instructions and specifications provided to them in confidence by Plaintiff. Before moving forward, however, the parties executed a non-disclosure/non-compete agreement. The explicit and exclusive purpose of the business relationship, which is reflected in the course of the Parties' dealings and detailed correspondence was for Defendants to supply the signature BJ1 Device. Both parties prospered greatly from this arrangement.

In a dramatic turn of events, however, Plaintiff learned that Defendants had misappropriated confidential, proprietary and trade secret information regarding the BJ1 Device and the BJ2 Device (collectively, the "BackJoy Products") and are now manufacturing, marketing, and selling their own unauthorized, illegal and low-quality versions of these products (the "Copy Products"). Defendants' actions are in direct violation of a Non-Disclosure and Non-Compete Agreement entered into between the parties on January 2, 2007 (the "Non-Compete Agreement") as well as the trust imposed in good faith by Plaintiff.[1]

At the time the Complaint was filed (see FN1 supra), Plaintiff had learned only that Defendants planned to proceed with production of the Copy Products. Plaintiff has now learned, however, that Defendants have accelerated the pace of their production and are actively seeking to sell their products globally. Moreover, Plaintiff has learned that there is actual confusion

[1] Jurisdiction and venue properly lie with this Court. (See Complaint Doc. 1 at ¶¶ 11-15.) The Non-Compete Agreement specifically provides for jurisdiction of courts (state or federal) sitting in Orange County, Florida, as well as for the application of Florida law. See Affidavit of Preston Willingham, dated April 24, 2014,¶ 7, Ex. B, C, previously submitted with Plaintiff's application for TRO (Mot. TRO Doc. 9) ("Willingham Aff.").

between the products in the marketplace. These circumstances warrant this Court's immediate intervention. Plaintiff has already experienced instances of real confusion in the marketplace and now faces the very real prospect of losing both authorized distributors and customers. Moreover, Plaintiff faces the potential devastating loss of goodwill due to the inferior quality of the Copy Products. Once goodwill is lost, it is virtually impossible to recover.

## FACTS SUPPORTING INJUNCTIVE RELIEF[2]

### A. Plaintiff's Formation, Development of Its Business, and Efforts to Protect Its Confidential, Proprietary, and Trade Secret Information.

Plaintiff owes its inception to a son's passion to ease his father's back pain. In 1984, Preston Willingham ("Willingham"), an entrepreneur, inventor and nationally-renowned sculptor, wanted to design a product that would ease the back pain and discomfort his father suffered. Willingham invented what turned out to be the first in an expanding line of BACKJOY®-branded products. During that same year, Willingham formed BackJoy of Florida, Inc. ("BJ Florida") as the vehicle to exploit this initial product. He later obtained a patent for his orthotic seat, Patent No. 5,887,951 (the "951 Patent"), as well as a trademark for the name BACKJOY. (Howenstein Aff., ¶ 8.).

Ever since, Plaintiff (and its predecessors) have been designing innovative and novel products to improve posture and reduce back pain. Plaintiff has offered a wide range of back support and posture products, including its flagship line of innovative orthotic seat supports, BACKJOY Core®, BACKJOY Posture+, BACKJOY Relief, BACKJOY Relief+, BACKJOY Posture+ Team, Relief Mini, Relief Mini+ and Posture+ Mini seat inserts. Plaintiff has

---

[2] Evidence demonstrating BackJoy's right to injunctive relief includes: (1) Affidavit of Bing Howenstein, dated April 24, 2014, submitted with Plaintiff's application for TRO (Mot. TRO Doc. 9) ("Howenstein Aff."); (2) the Willingham Aff.; and (3) Affidavit of Roman Khaykin, dated April 11, 2014, and submitted with Plaintiff's application for TRO (Mot. TRO Doc. 9) ("Khaykin Aff.").

developed a new version of the seat, incorporating a lumbar support, the BJ2 Device referenced above. The BJ2 Device is in manufacture and is expected to reach retail stores shortly. (Howenstein Aff., ¶ 7).[3]

In 2005, Willingham and BJ Florida terminated their relationship. Willingham then granted the rights to exploit the orthotic seat device (and all intellectual property and trade secrets appurtenant thereto) to Willingham Design & Manufacturing, Inc. -- the company that entered into the Non-Compete Agreement with Forvic. That same year, Howenstein joined with Willingham to continue to exploit Plaintiff's products. (Howenstein Aff., ¶¶ 9-10). As a result, BackJoy was formed. As of 2010, through a series of various transactions, Plaintiff holds all rights in and to its predecessors' intellectual property, rights to enforce previous agreements, and all rights developed subsequent thereto. (Howenstein Aff., ¶¶ 11-12).

Plaintiff takes various measures to protect its intellectual property as well as its confidential, proprietary, and trade secret information. Plaintiff specifically requires its suppliers, manufacturers, and distributors to sign non-disclosure and non-compete agreements (as applicable) prior to providing relevant information. (Howenstein Aff., ¶ 15).

**B.** **Defendants Were Granted Limited Access to Plaintiff's Confidential, Proprietary, and Trade Secret Information in Their Position as Plaintiff's Key Supplier/Manufacturer.**

Prior to 2007, Defendants were in the business of manufacturing materials used in footwear and had no expertise in the orthotic industry nor had they ever designed, developed, manufactured, distributed, offered for sale or sold any orthotic back products or seat inserts in any manner similar or related to any of BackJoy Products. (Willingham Aff., ¶ 6).

---

[3] Genuine BackJoy Products are sold throughout the United States and currently distributed in over 40 countries, including South Korea, through <u>authorized</u> distributors.

The first contact between Plaintiff and Defendants occurred on December 30, 2006, when Willingham contacted Forvic by email seeking information regarding their manufacturing capabilities. (Willingham Aff., ¶ 6, Ex. A). After corresponding via email, Yoon requested that Willingham send samples of BackJoy Products "for our study." (Willingham Aff., ¶ 7, Ex. B). Before making any such disclosure or shipment, Willingham emailed Yoon the Non-Compete Agreement and stated that he would send sample BackJoy Products provided Defendants signed and returned said agreement. (Willingham Aff., ¶ 7, Ex. C).

On January 3, 2007 Defendants signed the Non-Compete Agreement attached to Willingham's email from January 2, 2007. (Willingham Aff., ¶ 9, Ex. D). On that same day, Defendants emailed Plaintiff stating: "[b]asically, we agree what you mean in this agreement," (expressing at the same time some concerns about necessary internal disclosure of information to "mould planner, mould shops, raw material's [*sic*] supplier, raw materials' technicians etc") and went on to say:

> Of course, we will keep all informations confidencially [*sic*] for your goods and will train all people who are related with the development of your goods to treat all informations for your goods confidencially [*sic*]. But, the story (not serious informations or technical notice) for your goods will be able to flow to other place or to unknown people through us known people like above cases.

(Willingham Aff., ¶ 9, Ex. E). On January 4, 2007, Willingham responded via email that reads "Dear Wook Yoon, Your comments made me fell [*sic*] more confident about proceeding. I understand the issues very well. You are in the middle. How do you suggest we proceed? ", referring to moving forward with the business relationship. (Willingham Aff., ¶ 10, Ex. F). In response, Yoon provided the address for the samples to be shipped and noted that a meeting would be scheduled after they reviewed. (Willingham Aff., ¶ 10, Ex. G). In reliance on

Defendants' agreement to the Non-Compete Agreement, Plaintiff then moved forward to start a manufacturing relationship with Defendants. (Willingham Aff., ¶ 11).

Between 2007 and November 23, 2013, Defendants supplied and manufactured materials used in BackJoy Products as instructed by Plaintiff. Defendants initially had difficulty in manufacturing the orthotic seats. Willingham frequently traveled to meet with Defendants and their factory workers to provide them with relevant expertise and know-how in order for the BackJoy Products to be manufactured to Plaintiff's standards and specifications. In doing so, Willingham provided Defendants with confidential, proprietary, and secret information, including but not limited to, drawings, photographs, molds, prototypes, and how-to instruction manuals. (Willingham Aff., ¶¶ 13-14).

On repeated occasions, including at a meeting on November 23, 2013, Defendants confirmed that they had signed, agreed to, and understood the terms of the Non-Compete Agreement.

Plaintiff completely relied on Defendants' adherence to the terms of the Non-Compete Agreement in retaining Defendants as its supplier of BackJoy Products and disclosing its plans for new and improved versions of such products, including the BJ2 Device. (Willingham Aff., ¶¶ 12-13).

C.      **Plaintiff's 2007 Disclosure to Defendants of the Concept of a Lumbar-Support Orthotic Seat.**

On July 16, 2007, Willingham emailed Defendants regarding his company's confidential plans for developing an orthotic seat with lumbar support that included adjustable height capabilities. (Willingham Aff., ¶ 15, Ex. H). On December 11, 2008, at a meeting between Willingham and Yoon (the "December 11, 2008 Meeting"), Willingham provided Yoon with

prototypes of this new design, which ultimately became the BJ2 Device. (Willingham Aff., ¶ 15, Ex. I (photograph of Willingham and Defendant Yoon discussing prototype); Ex. J (photographs of design)).

In response, Defendants indicated they would not be able to make the product. In fact, they said no one could make such a product. Despite saying this, Defendants tried on several occasions to make Plaintiff's new device. However, all the proposed prototypes were rejected by Plaintiff due to their sub-standard construction. In 2010, Plaintiff made a final determination that the BJ2 Device would need to be made by a different manufacturer. (Willingham Aff., ¶¶ 16-17).

Nonetheless, in continuing good faith, Plaintiff maintained its relationship with Defendants and, until recently, routinely placed orders with Defendants for the manufacture of the BJ1 Device and other BackJoy Products. (Willingham Aff., ¶ 18).

**D.** **As Early as 2011, Defendants Misappropriated Plaintiff's Confidential and Proprietary Information to Start a Competing Business.**

Defendants' "S-Back" titled product is one of Defendants' Copy Products. (Howenstein Aff., ¶ 16). Defendants' websites currently advertise three different S-Back products, the "S-Back Pro," the "S-Back Standard," and the "S-Back backpack" *see, http://s-back.net/main/index.* Plaintiff has examined samples of the Copy Products. These products incorporate the design and know-how of the patented BJ1 Device as well as Plaintiff's extremely confidential plans for the BJ2 Device. Until Plaintiff disclosed its confidential information, Defendants had neither the knowledge nor concept of building an orthotic seat device with lumbar support. (Howenstein Aff., ¶¶ 16-18 and Willingham Aff., ¶ 6).

At least as early as 2011, during the period that Defendants were Plaintiff's sole supplier, Defendants stole the confidential information and trade secrets of Plaintiff in the BJ2 Device and the know-how it acquired from making the BJ1 Device to develop their Copy Products. This date can be determined because Defendants, with unmitigated gall, applied for and received various foreign patents[4] and trademarks relating to the S-Back -- all while keeping this secret from Plaintiff. (Howenstein Aff., ¶ 19). To do everything that Defendants have done would require them to have started no later than in 2011.

### E.    Defendants' Illegal Use of Plaintiff's Copyrighted Materials.

The Copy Products are advertised, promoted and sold in the same channels of trade and to the same customers as the BackJoy Products, including but not limited to advertising and promotion on the Internet. The Copy Products are marketed and promoted on Defendants' English-language website, http://healthchair.forvic.com/eng//. (Howenstein Aff., ¶ 22, Ex. E). Defendants  falsely advertise that the "S-Back" products are the "World's first cushioned back orthotic using body weight."  (http://healthchair.forvic.com/eng/index.php). This is, in fact, one of the claims associated with the '951 patent owned by Plaintiff, antedating Defendants' alleged invention. (Howenstein Aff., ¶ 23).

Plaintiff has developed and owns all rights, including copyrights, in its proprietary marketing and advertising material used in connection with its sale of  BackJoy Products. The design, configuration and distinctive features of its copyrighted photographs and drawings / catalogue / website (www.backjoy.com), and of works related thereto are wholly original with Plaintiff.  Plaintiff has registrations for its photographs and drawings / catalogue / website with

---

[4] Defendants have obtained a patent on the lumbar-support device in South Korea.  (Howenstein Aff., ¶ 19).  The application falsely identifies Defendants as the inventor and not Preston Willingham. *Id.*  Plaintiff has filed and is currently pursuing a cancellation proceeding in South Korea. (See Mot. Alternative Serv. Doc. 14 at ¶ 8).

the United States Copyright Office, under U.S. Registration No. VAu001156365. See **Exhibit A** attached hereto.

Defendants' marketing and related print and digital materials contain numerous photographs and drawings that are substantially similar to Plaintiff's copyrighted works. Defendants have "lifted" the layout, design and overall impression of Plaintiff's photographic illustrations to sell the Copy Products. (Howenstein Aff., ¶ 27, <u>Ex.</u> G; Compl., ¶¶ 45-48).

**F.      Defendants' Increasing Promotion of the Copy Products and Their Refusal to Stop.**

In late 2013, Plaintiff's authorized Korean distributor discovered the Copy Products being marketed at a trade show in South Korea. The Copy Products appeared substantially similar if not identical to BackJoy Products. The distributor notified Plaintiff of its discovery. This was the first notice Plaintiff had of Defendants' betrayal. (Howenstein Aff., ¶ 20).

Plaintiff determined that Defendants had just started to manufacture and market the Copy Products in the form of the S-Back Device. Plaintiff subsequently obtained samples of Defendants' S-Back and sought a meeting with Defendants to discuss the: (i) blatant copying by Defendants of the BJ1 Device; (ii) misuse by Defendants of confidential information including, in particular, the development of an orthotic seat device with a lumbar support; and (iii) the prohibited direct competition by Defendants. (Howenstein Aff., ¶ 21; Khaykin Aff., ¶¶ 5-11.).

On November 23, 2013, Plaintiff's representatives met with Defendants, to demand, among other things, that Defendants cease any manufacturing and sale of the S-Back Device or any other products that competed with BackJoy Products. Plaintiff delivered its demand orally and by letter. Defendants refused to stop. (Howenstein Aff., ¶ 24). Plaintiff terminated all business relations with Defendants at the end of 2013. (Howenstein Aff., ¶ 28).

In March 2014, Plaintiff was informed that Defendants had ramped up their sales efforts in South Korea in earnest. (Howenstein Aff., ¶ 30). Through investigation Plaintiff has learned that this is a first move on a global basis for Defendants. (Khaykin Aff., ¶ 11). As part of their global plan, Defendants are now going so far as to use laudatory references by alleged United States consumers. (Howenstein Aff., ¶ 30). The increased sales effort is a dramatic attempt by Defendants to steal the relevant market before they have to respond to the Complaint. In fact, Plaintiff has just learned that there is actual confusion between the Backjoy Products and the Copy Products in the marketplace. (Howenstein Aff., ¶ 31).

**ARGUMENT**

**I. THIS COURT HAS AUTHORITY TO ISSUE PRELIMINARY INJUNCTIVE RELIEF.**

District courts have discretion to issue preliminary injunctions to protect the moving party from irreparable injury and to preserve the power of the trial court to render a meaningful decision on the merits. See Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011). The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated. Lebron v. Florida Dep't of Children & Families, 2013 U.S. App. LEXIS 3998, at *5-6 (11th Cir. Feb. 26, 2013). Injunctive relief is proper where the moving party shows that: (1) there is a substantial likelihood of success on the merits; (2) it will suffer irreparable harm unless issued; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest. Int'l Cosmetics Exchange, Inc . v. Gapardis Health & Beauty, Inc., 303 F.3d 1242, 1246 (11th Cir. 2002). In considering a motion for preliminary injunction, a district court may rely on affidavits and hearsay materials that would not be

admissible as evidence for entry of a permanent injunction. Levi Strauss & Co. v. Sunrise Int'l Trading Inc.., 51 F.3d 982, 985 (11th Cir. 1995).

Several of the statutory claims asserted by Plaintiff specifically authorize the award of injunctive relief. The Copyright Act permits this Court to award injunctive relief to prevent future copyright infringement. See 17 U.S.C. § 502(a) (2012). The Lanham Act authorizes the award of injunctive relief to prevent continued unfair competition and false advertising. See 15 U.S.C. § 1116 (2012). The Florida Uniform Trade Secrets Act specifically authorizes a court to enter an injunction to prevent misappropriation. See Fla. Stat. § 688.003 (2012).[5] In addition, this Court has previously granted preliminary injunctive relief in similar situations based on the various state law claims asserted. See, e.g., Electrostim Med. Servs. v. Lindsey, et al., 2012 U.S. Dist. LEXIS 56243, at *32-33 (M.D. Fla. Mar. 13, 2012) (granting preliminary injunctive relief based on breach of contract claim for violation of restrictive covenant and disclosure of confidential business information). See also Ryan, LLC v. Evans, 2012 U.S. Dist. LEXIS 59692, at *23 (M.D. Fla. Apr. 30, 2012) (awarding preliminary injunction based on violation of the Florida Deceptive and Unfair Trade practice Act, Fla. Stat.§ 501.201). See also Fla. Stat. § 542.335(1)(j) (injunctions are "appropriate remed[ies]" to enforce restrictive covenants).

Defendants have begun to sell the Copy Products, giving rise to the urgency of the requested instant relief. Defendants' actions, which are in direct violation of the Non-Compete Agreement and predicated on the theft of Plaintiff's intellectual property, will -- unless restrained by this Court -- irreparably damage Plaintiff's hard-won goodwill with its customers and authorized distributors and the goodwill and intrinsic value of its global brand, BACKJOY®.

---

[5] Patent Laws also authorize the use of injunctive relief to prevent patent infringement.

## II.   PLAINTIFF SATISFIES ALL CONDITIONS FOR ISSUANCE OF THE PRELIMINARY INJUNCTION.

### A.   <u>Plaintiff Is Likely to Succeed on the Merits.</u>

Success on the merits is generally the most important factor when considering whether to grant a motion for preliminary relief.  <u>Schiavo v. Schiavo</u>, 403 F.3d 1223 (11th Cir. 2005).  The movant, however, must show "only <u>likely</u>, rather than certain, success."  <u>Home Oil Co., Inc. v. Sam's East, Inc.</u>, 199 F. Supp. 2d 1236, 1249 (M.D. Ala. 2002) (<u>emphasis in original</u>).  The requested Preliminary injunction is warranted because:

### 1.   Defendants Have Stolen Plaintiff's Trade Secrets in Violation of Florida's Uniform Trade Secret Act.

A claim for misappropriation of trade secrets under Florida's Uniform Trade Secret Act exists where: (1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy; and (2) the secret was misappropriated, either by one who knew or had reason to know that it was improperly obtained or by one who used improper means to obtain it.  <u>Del Monte Fresh Produce Co v. Dole Food Co., Inc.</u>, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) (applying Fla. Sta. § 688.002).  To qualify as a trade secret, the information must derive economic value (actual or potential) from not being readily ascertainable to others who would benefit from its disclosure, and it must be subject to efforts which are reasonable under the circumstances to maintain its secrecy.  <u>Id</u>.

As explained above, Plaintiff had in its possession confidential and proprietary information relating to its orthotic seat (BJ1 Device) and plans for a lumbar-support version (BJ2 Device).  That information was not known to others in the industry and was the brain-child of Willingham, the Chief Technology Officer, who retained all information regarding concepts, prototypes, etc. on his computer.  Moreover, BackJoy took definitive steps to protect the plans'

secrecy, including the requirement for manufacturers and suppliers to sign non-disclosure and non-competition agreements.  See, e.g., Fadalla v. Life Automotive Prods., Inc., 258 F.R.D. 501, 506 (M.D. Fla. 2007) (holding that an employer "makes reasonable efforts" where he enters into non-disclosure and secrecy agreements to maintain the confidentiality of information.").

By misappropriating BackJoy's technology -- provided to it in strictest confidence -- to manufacture, market, and sell the Copy Products, Defendants have engaged in improper misappropriation of trade secrets under the Florida Uniform Trade Secrets Act, Chapter 688, Florida Statutes.  Cf. Stoneworks, Inc. v. Empire Marble & Granite, Inc., No. 98-2017, 1998 U.S. Dist. LEXIS 21762 at *11 (S.D. Fla. Nov. 19, 1998) (stating that misappropriation of trade secrets is a "foregone conclusion where a trusted employee [or other business associate] discloses trade secrets after receiving them under circumstances of obvious confidentiality and contractual obligations," and that Chapter 688 "specifically provides for injunctive relief against actual and threatened misappropriation.").  Under the Uniform Trade Secrets Act "[a]ctual or threatened misappropriation may be enjoined."  Section 688.003(1), Florida Statutes.  Indeed, where confidential business information and/or trade secrets are threatened, courts routinely award injunctive relief.  See, e.g., Demit of  Venezuela, C.A. v. Electronic Water Systems, Inc., 547 F. Supp. 850, 854 (S.D. Fla. 1982), aff'd 740 F.2d 977 (11th Cir. 1984).

### 2. Defendants' Unfair Competition violates the Lanham Act as well as State Law.

#### a. Lanham Act Violations

To state a claim for unfair competition/false advertising under the Lanham Act, 15 U.S.C. § 1051 et seq., Plaintiff must allege:  (1) the opposing party's advertisements are false or misleading; (2) the advertisements deceived or had tendency to deceive targeted audience; (3) the deception is material; and (4) the plaintiff has been or is likely to be injured as a result.  See

14

Third Party Verification, Inc. v. Signaturelink, Inc., 492 F. Supp. 2d 1314, 1324 (M.D. Fla. 2007). Unfair competition under Florida common law is an "umbrella [claim] for all . . . causes of action . . . contrary to honest practice [and no single set of elements will apply]." Id. at 1325. Instead, courts apply elements from established causes of action (such as Lanham Act or FDUTPA) on a case by case basis. See Planetary Motion, Inc. v. Techplosion, Inc., 261 F.3d 1188, 1193 (11th Cir. 2001). Defendants falsely advertise that the Copy Products are "the world's first cushioned back orthotic using body weight." (A claim Plaintiff has made associated with the BJ1 Device, which Defendants know to be true). In fact, Defendants have gone so far as to erroneously assert that they created the initial BJ1 Device. (See Khaykin Aff., ¶ 8). A claim patently false on its face. Moreover, the false claim is material to customers' purchasing decision in that a reasonable customer is likely to rely on the reputation for quality and effectiveness of the BJ1 Device in electing to purchase what is alleged to be that device's successor, manufactured from the same seemingly reliable source. Defendants damage Plaintiff's reputation by falsely associating BackJoy with their inferior Copy Products, and have unfairly usurped a portion of BackJoy's market share and thus, sales.

### b. FDUTPA Violations

The FDUTPA is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). Under FDUTPA, a litigant must demonstrate three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. Dynamic Designs Distribution Inc. v. Nalin Mfg., LLC, No. 8:13-cv-707-T-33TBM, 2014 WL 1576381, AT *8 (M.D. Fla. Apr. 18, 2014). "A deceptive practice is one that is likely to mislead consumers." Rollins, Inc. v. Butland,

951 So. 2d 860,869 (Fla. 2d DCA 2006). "An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." <u>Id.</u> Anyone aggrieved by a violation of this statute may bring an action . . . to enjoin a person who has violated, is violating, or is otherwise likely to violate this part." § 501.211(1), Fla. Stat. (2013). Plaintiff satisfies all three criteria.

By usurping Plaintiff's confidential and proprietary information to manufacture, market, and <u>sell</u> the Copy Products, Defendants have unscrupulously used a relationship of trust to advance their own interests to the detriment of BackJoy, in violation of the well-established public policy against misappropriation. <u>See</u>, <u>e.g</u>. Fla. Stat. § 688.003 (2012). Moreover, Defendants have made deceptive claims to the consuming public by falsely holding themselves out to be the source of the BJ1 Device, thus free-riding on Plaintiff's goodwill, and misleading consumers to rely on that false association (between Backjoy Products and the Copy Products) when making their purchasing decisions. (Howenstein Aff., ¶ 31). Finally, Defendants have used BackJoy's copyrighted materials to market the Copy Products in violation of the long-standing public policy against unauthorized, third-party use of original works embodied in the Copyright Act, 17 U.S.C. § 101, *et seq.* This practice is substantially injurious to consumers in that it creates the deceptive impression that Defendants' false statements, which associate the Copy Products with BackJoy Products are all the more likely to be true because such other aspects of Defendants' marketing and website are also nearly identical to BackJoy's. This further misleads consumers into believing that both products are derived from a common source. Plaintiff has been aggrieved by these practices as the false association between Plaintiff's goods and the inferior Copy Products damages Plaintiff's reputation and goodwill. The misappropriation of its trade secrets to create the Copy Products has resulted in Plaintiff not being the exclusive

manufacturer of orthotic devices featuring the unique features of the BJ1 and BJ2 Devices, leading to a loss of market share and distributors. (Howenstein Aff., ¶¶ 32-33). Finally, Plaintiff can and will demonstrate a loss of profits directly attributable to Defendants' actions. Thus, BackJoy meets all the necessary elements to prevail on it its FDUTPA claim.

### 3. Defendants Are in Breach of the Non-Compete Agreement.

Florida Statute § 542.335(1)(a)-(c) sets forth the requirements for enforcing restrictive covenants under Florida law. Such covenants must be reasonable in time, area, line of business, and must be justified by one or more legitimate business interests. It is well settled in Florida that the protection of "confidential business information is considered a legitimate business interest that can be protected by a restrictive covenant." AutoNation, Inc. v. O'Brien, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004). Finally, Florida Statute § 542.335(1)(b) provides that "a court shall not enforce a restrictive covenant unless it is set forth in a writing signed by the person against whom enforcement is sought." However, where the signed agreement has been lost or unintentionally destroyed, the court should nonetheless enforce the covenant provided the party to be charged admits to having signed it, and the court is satisfied as to evidence of its essential terms. Environmental Services, Inc. v. Carter, 9 So. 3d 1258, 1267 (Fla. 5th DCA, 2009).

Although Plaintiff has unintentionally lost the signed copy of the Non-Compete Agreement, Defendant Forvic has admitted to having signed the Non-Compete Agreement as enclosed in its entirety, and in writing in the Parties' email conversation dated January 3, 2007. (Howenstein Aff, ¶ 14; Willingham Aff, ¶ 12 ). In such agreement, Defendant Forvic agreed not to compete by "making or marketing a device substantially similar to the BackJoy Orthotic Seat." (Howenstein Aff., ¶ 14). This covenant was necessary to, among other things, protect Plaintiff's: (1) relationships with prospective and existing customers and authorized distributors

17

worldwide; (2) trade secrets and proprietary information; and (3) hard earned reputation and goodwill associated with its trademarks and products. Because this covenant is at the heart of a negotiated business transaction, it is even more restrictive than a covenant merely incidental to employment. See, e.g., USI Ins. Servs. of Florida, Inc. v. Pettineo, 987 So.2d 763, 766-67 (Fla. Fla. 4th DCA, 2008) (recognizing the distinction between employment covenants and those bargained for in transactions).[6] Regardless, while still acting as Plaintiff's supplier, Defendants secretly set up a competitive business using trade secrets provided to them by Plaintiff.

### 4. Defendants Are Improperly Using Plaintiff's Copyrighted Materials in Marketing the Copy Products.

In evaluating whether a plaintiff has a substantial likelihood of success on the merits for copyright infringement, the Court must look to determine whether a plaintiff holds a protected copyright and its registration as well as whether the defendants wrongfully reproduced the copyrighted property. Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349 (1991). copyright protection attaches at the moment of creation. Copyright Act, 17 U.S.C. § 302(a).

Here, Plaintiff developed the photos and drawings for use in connection with its BackJoy Products long before Defendants began to use them on their website to market and sell the Copy Products. (Howenstein Aff., ¶¶ 25-26). Defendants had access to the photos and drawings only as a result of their business relationship with Plaintiff. Plaintiff has obtained copyright registrations for the materials which Defendants have misused. See **Exhibit A** attached hereto. Plaintiff never authorized Defendants' use of the materials in connection with the sale of the

---

[6] Florida law not only permits but specifically encourages courts to modify "unreasonable" non-competes rather than refuse to enforce. See Pinch-A-Penny of Pinellas County v. Chago, 557 So.2d 940 (Fla. 2d DCA, 1990) (citing Miller Mech., Inc. v. Ruth, 300 So.2d 11 (Fla. 1974)).

Copy Products. Defendants' use of Plaintiff's copyrighted materials is unlawful and should be restrained.

**B.    Plaintiff Is Suffering Irreparable Harm.**

In order to qualify as irreparable, harm must be both "actual and imminent," which it is in the instant matter. Northeastern Fla. Chapter of the Assoc. of General Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990). Defendants have, among other things: (1) used Plaintiff's confidential and proprietary information – including trade secrets – to manufacture and sell the Copy Products in direct competition with Plaintiff; (2) infringed on Plaintiff's copyrighted materials to market the Copy Products; (3) violated the non-compete provision contained in the Non-Compete Agreement; and (4) damaged Plaintiff's reputation and goodwill by developing a nearly identical Copy Product that is likely to be confused with the actual BackJoy Products, but which is vastly inferior in every respect. Defendants' escalation of activities from manufacturing and marketing to actual sales in earnest renders the likelihood of ham imminent.

**1.    Irreparable Harm Is Presumed as to Defendants' Violation of FUTSA.**

Violation of a Florida statute that expressly authorizes a court to provide injunctive relief automatically gives rise to a presumption that the plaintiff has suffered irreparable harm. See Select Portfolio Servicing, Inc. v. Evaluation Solutions, L.L.C., 2006 U.S. Dist. LEXIS 67276, at *36 (M.D. Fla. Sept. 20, 2006). The statute specifically provides that any misappropriation, whether actual or merely threatened, may be enjoined. See Fla. Stat. § 688.003; see also Hatfield v. AutoNation, Inc., 939 So.2d 155, 157 (Fla. 4th DCA, 2006) (stating that "[a]n injunction with respect to stolen business secrets . . . will eliminate commercial advantage derived from the misappropriation.").

### 2. Irreparable Harm Is Presumed as to Defendants' Breach of the Non-Compete Agreement.

Similarly, "violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." See Electrostim, at *37 (citing Fla. Stat. § 542.335(1)(j)). Irreparable harm is presumed to result from the breach of a contract that protects legitimate business interests. "[A] party seeking to enforce a restrictive covenant by injunction need not directly prove that the defendant's specific activities will cause irreparable injury if not enjoined. Rather, '[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." Variable Annuity Life Ins. Co. v. Hausinger, 927 So. 2d 243 (Fla. 2d DCA, 2006) (citations omitted). The Florida Supreme Court "has held repeatedly that the "focus of preliminary injunctive relief is on maintaining long-standing relationships and pre-serving the goodwill of a company built up over the course of years of doing business." Id.; see also North American Products Corp. v. Moore, 196 F. Supp. 2d 1217, 1230-31 (M.D. Fla. 2002).

### 3. Irreparable Harm Is Presumed Because of Defendants' Use of Plaintiff's Copyrighted Material.

The Court may also presume irreparable harm because Plaintiff has shown a likelihood of success on the merits of its copyright infringement claim. Exchange Int'l., Inc. v. Vacation Ownership Relief, LLC, 2010 WL 4983669, at *9 (M.D. Fla. Oct. 27, 2010) (citing CBS Broad., Inc. v. EchoStar Communs. Corp., 450 F.3d 505, 517 (11th Cir. 2006) ("Under the Copyright Act, however, a plaintiff need not show actual irreparable harm in order to obtain an injunction, so long as there is past infringement and a likelihood of future infringement.")). In the case at hand, it is enough that Defendants continue to display infringing materials on their website.

####     4.     Even Without a Presumption, Plaintiff has Established Irreparable Harm.

Defendants' activities in (i) marketing the Copy Products; (ii) making false claims with respect thereto; (iii) seeking to "steal" Plaintiff's hard-won markets and relationships; (iv) accelerating efforts to sell the Copy Products in Plaintiff's markets; and (v) actual sales of the Copy Products, which are nearly identical to but inferior in every respect to BackJoy Products, greatly tarnish Plaintiff's reputation and goodwill thereby resulting in a loss of distributors as well as customers. Defendants' actions have already begun to impact Plaintiff's relations with its distributors. (Howenstein Aff., ¶¶ 31-32). Monetary compensation will not be sufficient to redress Plaintiff from these wrongs. "Although economic losses alone do not justify a preliminary injunction, 'the loss of customers [and other business associates] and goodwill is an irreparable injury' [for which preliminary injunctions are appropriate]." Mohr v. Bank of New York Mellon Corp., 393 F. App'x. 639, 646, 2010 WL 3273059, at *6 (11th Cir. 2010) (quoting BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F. 3d 964, 970 (11th Cir. 2005)). Ride-Away Handicap Equip. Corp. v. Tracey, 2009 U.S. Dist. LEXIS 124610, *27-28 (M.D. Fla. Dec. 29, 2009) (holding that the loss of goodwill and fair competition may not be easily remedied by monetary damages). Independent of the statutory presumptions of irreparable harm, irreparable harm is supported on the facts alone.

### C.     The Balance of Equities Overwhelmingly Favors BackJoy.

The equities of this case tip sharply in favor of Plaintiff, whose lawful intellectual property is being misappropriated and infringed. See Specialty Chem. & Servs., Inc. v. Chandler, 1:87-CV–2338-MHS, 1988 WL 618583, at *11 (N.D. Ga. Sept. 29, 1988) (finding that "[d]efendants cannot suffer compensable harm when enjoined from unlawful activity").

Defendants eventually may be entitled to develop their own orthotic-seat concept and compete in the market place. They are not, however, entitled to develop Copy Products that are substantially identical to the BackJoy Product using Plaintiff's own confidential, proprietary and secret information, which was provided to them in strictest confidence. Defendants' unclean hands tip the balance of equities completely in favor of Plaintiff.

**D.**      <u>**Public Policy Favors Granting the Preliminary Injunction.**</u>

     **1.**      **The Public Interest Is Served by the Protection of Trade Secrets.**

It is well-settled that the public interest is served by protecting trade secrets. <u>Metallurgical Indus., Inc. v. Fourtek, Inc.</u>, 790 F. 2d 1195, 1201 (5th Cir. 1986). As this Court has previously recognized, a preliminary injunction affirmatively serves the public interest "by preserving the faith in the contractual agreements that businesses routinely make . . . and by rightfully protecting trade secrets from unlawful use and disclosure." <u>Int'l. Hair & Beauty Systs., LLC v. Simply Organic, Inc.</u>, 8:11-CV-1883-30AEP, WL 5359264 (M.D. Fla. Sept. 26, 2011).

     **2.**      **The Public Interest Is Served by the Prevention of Unfair Competition in Violation of Federal and State Law.**

The Court has a duty to enforce the law to stop unfair competition within the marketplace. "Although vigorous competition is a public interest . . ., the public is better served when misleading information is curtailed." <u>Star-Brite Distributing, Inc. v. Kop-Coat, Inc.</u>, 664 F. Supp. 2d 1246, 1255 (S.D. Fla. 2009); 15 U.S.C. § 1125(a) (Lanham Act prohibits unfair competition).

     **3.**      **The Public Interest Is Served by the Enforcement of Restrictive Covenants.**

The public interest also is best served by an injunction preventing Defendants from continuing to violate the Non-Compete Agreement. Public policy in Florida "favors

enforcement of reasonable covenants not to compete." O'Brien, 347 F. Supp. 2d at 1308; New Horizons Computer Learning Centers, Inc. v. Silicon Valley Training Partners, Inc., 2:02-CV-459-FTM-29-SPC, 2003 WL 23654790, at *8 (M.D. Fla. Nov. 12, 2003) ("the public has an interest in the enforcement of restrictive covenants.").

### 4. The Public Interest Is Served by the Protection of Copyrighted Materials.

Finally, public interest can only be served by upholding copyright protection and preventing the misappropriation of protected works. Stoneworks, Inc. v. Empire Marble & Granite, Inc., No. 98-2017, 1998 U.S. Dist. LEXIS 21762 at *17 (S.D. Fla. Nov. 19, 1998); Lakedreams v. Taylor, 932 F.2d 1103, 1110 (5th Cir. 1991). The public's general interest in competition is outweighed by concomitant interest in preserving rights protected by federal copyright law. Taylor, 932 F.2d at 1110.

## II. THE BOND POSTED BY BACKJOY SHOULD BE MAINTAINED

The Federal Rules of Civil Procedure state that a bond must be posted whenever a court issues a preliminary injunction. Fed. R. Civ. P. 65(c). Pursuant to this Court's Temporary Restraining Order, dated May 2, 2014 (Doc. 10, Section V, at ¶ 3), Plaintiff posted a $10,000 bond on May 6, 2014. Given that Defendants' egregious conduct in misappropriating Plaintiff's trade secrets, trying to pass off the lumbar support feature of the Copy Product as their own invention, and infringing Plaintiff's copyrighted materials for their own advertising purposes, the current $10,000 bond is sufficient and should be maintained.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court enter an Order, in the form proposed, preliminarily enjoining Defendants, their agents, employees, and all

other persons in privity or acting in concert with Defendants from the acts described herein that misappropriate BackJoy's trade secrets, infringe upon its copyrighted material, and violate the Non-Compete Agreement agreed to by Defendants.

Respectfully submitted,

BACKJOY ORTHOTICS LLC

By its attorneys,

/s/ Jackson Adams
FL Bar Number 47970
Attorney, Backjoy Orthotics, LLC
Jackson W. Adams, P.A.
33 East Robinson St. Suite 206
Orlando, FL 32801
Telephone (407) 545-2249
Fax (407) 386-7915
E-mail: jadams@jwa-law.com

OF COUNSEL:
MCCARTER & ENGLISH, LLP
Harley I. Lewin
James H. Donoian
245 Park Avenue, 27 Fl.
New York, New York 10167

Dated:  July 13, 2015